IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 22- |
| v. | : | DATE FILED: _____ |
| TODD GOODMAN<br>ERIC PESTRACK | : | VIOLATIONS:<br>21 U.S.C. §846 (conspiracy to distribute controlled substances – 1 count)<br>21 U.S.C. §841 (distribution of controlled substances - 9 counts)<br>18 U.S.C. §2 (aiding and abetting)<br>Notice of forfeiture |
| | : | |
| | : | |

## INDICTMENT

## COUNT ONE

**(Conspiracy to Distribute Controlled Substances)**

**THE GRAND JURY CHARGES THAT:**

At all times material to this indictment:

1. Mitchell Spivack (charged elsewhere) was a registered pharmacist in the Commonwealth of Pennsylvania. Since in or about 1987, Spivack owned and operated Spivack, Inc. d/b/a Verree Pharmacy (hereinafter "Verree") located at 7960 Verree Road, Philadelphia, Pennsylvania. Spivack was registered with the Pennsylvania State Board of Pharmacy as Verree's pharmacist in charge.

2. Verree was a small, neighborhood pharmacy that was open for business seven days per week. The Drug Enforcement Administration ("DEA") granted a registration to Verree which allowed it to purchase and dispense Schedule II through V controlled substances.

3. Defendant TODD GOODMAN was employed as a part-time pharmacist at Verree for approximately 20 years. He was registered as a licensed pharmacist since in or about August 1986.

Defendant GOODMAN typically worked on Wednesday evenings and weekends. He filled prescriptions, ordered medications, assisted at the pharmacy counter, and was entrusted with a key to open the pharmacy and the combination to the pharmacy safe.

4.   Defendant ERIC PESTRACK was employed as the lead pharmacy technician at Verree for more than thirty years. Defendant PESTRACK worked full time, usually Monday through Friday. He also covered weekend shifts when another pharmacy technician ("Person 1"), known to the grand jury, was unavailable. Defendant PESTRACK assisted at the pharmacy counter, filled prescriptions under the direction of the pharmacist on duty, ordered medications, and was entrusted with a key to open the pharmacy and the combination to the pharmacy safe.

### The Controlled Substances Act

5.   The Controlled Substances Act ("CSA") governs the manufacture, distribution, and dispensing of controlled substances in the United States. Under the Controlled Substances Act, there are five schedules of controlled substances – Schedules I, II, III, IV, and V. Controlled substances are scheduled into these levels based upon their potential for abuse, among other things. For example, abuse of Schedule II controlled substances may lead to severe psychological or physical dependence. Abuse of Schedule III controlled substances may lead to moderate or low physical dependence or high psychological dependence. Abuse of Schedule IV controlled substances may lead to more limited physical dependence or psychological dependence relative to the drugs or other substances in Schedule III.

6.   Oxycodone is a generic version of the opioid drug OxyContin. Oxycodone classified as a Schedule II controlled substance. Opioids were used to treat moderate to severe pain. Opioids could cause physical and psychological dependence, even when taken as prescribed. At high

doses, opioids would cause life threatening conditions or death, especially when used in combination with other controlled substances and/or alcohol.

7. Methadone was a synthetic opioid that was classified as a Schedule II controlled substance. Methadone was used to relieve severe pain in people who required pain relief around the clock and could not be treated with other medications. Methadone was a highly addictive drug which could cause life-threatening conditions or death, especially when used in combination with other narcotics and/or alcohol. Methadone was also used to prevent withdrawal symptoms in patients who were addicted to opiate drugs and who were enrolled in addiction treatment programs.

8. Amphetamine was generic version of the brand name drug Adderall. Amphetamine was a potent, and highly addictive central nervous system stimulant classified as a Schedule II controlled substance. Amphetamine was also used as a performance and cognitive enhancer, and recreationally used as an aphrodisiac and a euphoriant. At therapeutic doses, amphetamine could cause emotional and cognitive changes. At high doses, amphetamine could impair cognitive function, including psychosis.

9. Alprazolam was a generic version of the brand name drug Xanax. Alprazolam was an addictive prescription sedative and anti-anxiety agent and was classified as a Schedule IV controlled substance. Alprazolam was a central nervous system depressant classified as a benzodiazepine. When taken in combination with opioids, benzodiazepines have been shown to cause overdose and death.

10. The CSA required those who distributed or dispensed controlled substances, including pharmacies that dispense controlled substances pursuant to a prescription, to obtain a registration from the DEA. 21 U.S.C. § 822(a). Individuals or entities who have a registration are commonly referred to as "registrants."

11. The registration requirements for those who dispensed were based on the statute's definition of a "dispenser," which is defined as "a practitioner who [] delivers a controlled substance to an *ultimate user*" "pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance." 21 U.S.C. § 802(10) (emphasis added). That definition includes retail pharmacies that dispense controlled substances directly to patients. *See id.* § 802(21) (defining "practitioner" to include a "pharmacy"). When controlled substances are delivered not pursuant to a valid prescription, the CSA defines this delivery as a "distribution." *See* 21 U.S.C. § 802(11).

12. Even when a registrant such as a retail pharmacy fell within the definition of "dispenser" and received authorization through a DEA registration to dispense controlled substances, it could only dispense a controlled substance as "authorized by their registration and in conformity with the other provisions of" the CSA. *Id.* § 822(b).

13. For entities such as retail pharmacies registered to dispense controlled substances, the CSA established strict limitations on when a controlled substance could be dispensed to the patient and ultimate user. It generally provided that, unless a non-pharmacy practitioner dispensed directly or there was an emergency, Schedule II, III, and IV controlled substances could only be dispensed upon a "prescription." 21 U.S.C. § 829(a), (b).

14. Under the CSA, a prescription was effective only if issued for a "legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a).

15. In addition, the CSA's implementing regulations provided direction specifically for pharmacists by providing that "[a] prescription for a controlled substance may only be filled by a

pharmacist, acting in the usual course of his professional practice and either registered individually or employed in a registered pharmacy . . . ." 21 C.F.R. § 1306.06.

16. The CSA's implementing regulations explicitly warned pharmacists of the consequences of dispensing or distributing a controlled substance without satisfying these requirements. 21 C.F.R. § 1306.04(a) stated that the "responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a *corresponding responsibility* [for proper dispensing of controlled substances] rests with the pharmacist who fills the prescription. An order purporting to be a prescription issued not in the usual course of professional treatment . . . is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. [§ ]829) and the person knowingly filling such a purported prescription . . . shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances."

17. With respect to "corresponding responsibility," pharmacists had a legal duty to ensure that prescriptions for controlled substances were legitimate before dispensing the controlled substance. The fact that a licensed physician actually or ostensibly prescribed a controlled substance did not obligate a pharmacist to fill that prescription. A reasonably prudent pharmacist must be familiar with suspicious activity or "red flags" indicating that the controlled substances prescribed were at risk for abuse or diversion. A pharmacist was likewise required to check the Pennsylvania Prescription Drug Monitoring Program ("PDMP") for suspicious prescriptions. The PDMP system was an electronic database that collected information on *all* filled controlled substance prescriptions. The pharmacist was required to check the PDMP to ensure that the patient was not obtaining controlled substances from more than one provider, was filling controlled substances at other pharmacies, and other "red flags" about the propriety of a controlled substance prescription.

18.  A "red flag" could include anything about a controlled substance prescription that would cause the pharmacist to be concerned that the prescription was not issued for a legitimate medical purpose by a registered prescriber in the usual course of professional practice. Some of the red flags for diversion that all pharmacists should be familiar included the following:

   a) The prescriptions were for high dosage strengths of the drug and/or for large quantities.

   b) The prescriptions were part of a "cocktail." A prescription "cocktail" was usually a prescription for an opioid, such as oxycodone, combined with a prescription for a benzodiazepine (anti-anxiety drug) such as alprazolam (also known by its brand name, Xanax), and possibly a muscle relaxant, such as carisoprodol (also known by its brand name, Soma) or cyclobenzaprine (also known by its brand name Flexeril.) Cocktail combinations were often sought by drug abusers because they produced an intensified "high," but they could be particularly deadly. The combination of an opioid, benzodiazepine, and muscle relaxant was typically referred to as a *Trinity Cocktail.*

   c) Patients were willing to pay large sums of cash (or write checks or use credit cards) for controlled substances, especially when the patients had insurance coverage available for the drugs.

   d) Patients who consistently received "early refills" of controlled substance prescriptions.

   e) Two or more controlled substance prescriptions were issued together which indicated duplicate therapy, for example, when a patient was issued two or more prescriptions known to treat the same condition in the same manner.

   f) The patient's address was a significant distance from the prescriber's address and/or the pharmacy's address.

19.  When confronted with one or multiple red flags concerning a prescription for controlled substances, a pharmacist was required to intervene and resolve the red flags to determine whether the prescription was for a legitimate purpose before filling it. The pharmacist must also document his or her findings for future use and reference.

## THE CONSPIRACY

20. From on or about January 1, 2012, through on or about December 31, 2019, in the Eastern District of Pennsylvania, defendants

**TODD GOODMAN and
ERIC PESTRACK**

conspired and agreed together, and with Mitchell Spivack (charged elsewhere) and others known and unknown to the grand jury, to commit the following offenses against the United States:

   a. to knowingly and intentionally distribute and dispense, outside the usual course of professional practice and for no legitimate medical purpose, a mixture and substance containing a detectable amount of oxycodone, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(C);

   b. to knowingly and intentionally distribute and dispense, outside the usual course of professional practice and for no legitimate medical purpose, a mixture and substance containing a detectable amount of methadone, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(C);

   c. to knowingly and intentionally distribute and dispense, outside the usual course of professional practice and for no legitimate medical purpose, a mixture and substance containing a detectable amount of amphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(C); and

   d. to knowingly and intentionally distribute and dispense, outside the usual course of professional practice and for no legitimate medical purpose, a mixture and substance containing a detectable amount of alprazolam, a Schedule IV controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(E).

## MANNER AND MEANS

It was part of the conspiracy that:

21. Defendants TODD GOODMAN and ERIC PESTRACK, and Mitchell Spivack (charged elsewhere), caused Veree to become the top retail pharmacy purchaser of oxycodone in Pennsylvania. Defendants GOODMAN and PESTRACK agreed with Spivack and others to cultivate a reputation for Verree as an easy fill, no questions asked pharmacy for large quantities of oxycodone or opioid combinations. Verree filled so many opioid prescriptions that a long line of customers often extended outside of the pharmacy and around the block.

22. Defendants TODD GOODMAN and ERIC PESTRACK dispensed and distributed controlled substances based on obviously altered prescriptions for oxycodone without verifying the prescription with the issuing physician, including with two drugs on one paper prescription – one a legitimately prescribed non-controlled substance on one side and the second, the controlled substance oxycodone added on the other side by forgery. Even though the prescriptions for oxycodone were obviously altered, defendants GOODMAN and PESTRACK filled these prescriptions so long as a customer could pay for the drugs.

23. To avoid scrutiny by health care benefit programs which monitored the amount of opioids dispensed to beneficiaries and to generate untraceable cash proceeds, defendants TODD GOODMAN and ERIC PESTRACK frequently required payment in cash for oxycodone prescriptions even though the customer had insurance. Patient 1, known to the grand jury, had acquired a Health Maintenance Organization ("HMO") insurance plan in March of 2015. When Patient 1 presented the HMO card as payment for forged oxycodone prescriptions, defendant PESTRACK advised Patient 1 that "insurance won't cover these…. cash only, cash preferred."

24. To ensure a continued supply of oxycodone, defendants TODD GOODMAN and ERIC PESTRACK agreed with Mitchell Spivack to deceive Verree's wholesale supplier of controlled substances. During the period from in or about January 2014 through in or about December 2019, Wholesaler 1, known to the grand jury, was Verree's sole oxycodone supplier. Verree's other supplier had stopped doing business with Verree because of diversion concerns.

25. In or about August of 2016, at the urging of Wholesaler 1's compliance department, Verree created a "Due Diligence Procedure for Controlled Substances" to ensure that the pharmacy was responsibly distributing controlled substances. At that time, Wholesaler 1 had concerns about diversion of opioids it was supplying to Verree. The policy stated that, at a minimum, Verree's employees, including defendants TODD GOODMAN and ERIC PESTRACK, would check the state PDMP system; require use of insurance unless a reasonable explanation was provided; and document and verify prescriptions when the patient or prescriber was out of the area of service. Defendants GOODMAN and PESTRACK signed the bogus policy that was provided to Wholesaler 1. Although defendants GOODMAN and PESTRACK assured Wholesaler 1 that they would adhere to the policy, they did not.

26. In or about November 2018, Wholesaler 1 notified Verree that it would impose a mandatory reduction in the number of controlled substances that it would sell to Verree due to ongoing concerns over the pharmacy's dispensing practices. In response to the reduction, Verree created a "Narc Member" club that required patients to pay "dues" to ensure that their prescriptions for oxycodone would be filled without question. "Narc Members" typically paid the defendants monthly dues of between $25 to $100 cash.

27. From in or about January 2012 through in or about December 2019, Verree generated substantial profits estimated at approximately $5 million, primarily as a result of illegally distributing controlled substances.

### OVERT ACTS

In furtherance of the conspiracy and to accomplish its objects, defendants TODD GOODMAN and ERIC PESTRACK committed the following overt acts, among others, in the Eastern District of Pennsylvania:

1. On or about June 10, 2015, defendants TODD GOODMAN and ERIC PESTRACK filled an obviously altered prescription for a wholesale quantity of oxycodone for Patient 1. Defendants GOODMAN and PESTRACK required Patient 1 to pay $600 cash for the oxycodone.

2. On or about June 17, 2015, defendant TODD GOODMAN filled an obviously altered prescription for a wholesale quantity of oxycodone for Patient 2, known to the grand jury. Patient 2 was the spouse of Patient 1, and they resided together at the same address. Patient 2 paid $720 cash for the oxycodone.

3. On or about the dates below, each date a separate Overt Act, defendants TODD GOODMAN and ERIC PESTRACK filled oxycodone prescriptions for Patient 1 and Patient 2, without resolving the obvious "red flags" with the prescriber regarding the escalating quantities of dangerous and addictive oxycodone pills. In fact, had defendants GOODMAN and PESTRACK contacted the prescribing physician as required, they would have been told that the prescriptions were forgeries.

| Overt Act | Patient | Approx. Date | Drug | Approx. Cash Payment by Patient 1 |
|---|---|---|---|---|
| 3 | Patient 1 | March 29, 2017 | 360 oxycodone 30 mg. | $1,080 |
| 4 | Patient 2 | April 5, 2017 | 360 oxycodone 30 mg | $1,080 |
| 5 | Patient 1 | May 3, 2017 | 240 oxycodone 30 mg | $720 |

| Overt Act | Patient | Approx. Date | Drug | Approx. Cash Payment by Patient 1 |
|---|---|---|---|---|
| 6 | Patient 1 | May 17, 2017 | 240 oxycodone 30 mg. | $720 |
| 7 | Patient 1 | May 31, 2017 | 240 oxycodone 30 mg. | $720 |
| 8 | Patient 1 | June 14, 2017 | 360 oxycodone 30 mg. | $1,080 |
| 9 | Patient 2 | July 12, 2017 | 270 oxycodone 30 mg | $810 |
| 10 | Patient 1 | August 2, 2017 | 300 oxycodone 30 mg | $900 |
| 11 | Patient 1 | November 22, 2017 | 240 oxycodone 30 mg. | $720 |

12. On or about October 18, 2017, defendants TODD GOODMAN and ERIC PESTRACK filled prescriptions for Patient 3, known to the grand jury, for a dangerous combination of 1) 180 tablets of 10 mg of cyclobenzaprine; 2) 120 tablets of 30 mg oxycodone; and 3) 90 tablets of 80 mg OxyContin. Only weeks before, Patient 3 had filled a prescription at Verree for 120 tablets of 2 mg alprazolam.

13. On or about December 2017 and January 2018, defendants TODD GOODMAN and ERIC PESTRACK filled dangerous "*Trinity Cocktail*" prescriptions for Patient 4, known to the grand jury. For example, on or about December 13, 2017, defendants GOODMAN and PESTRACK distributed the following controlled substances to Patient 4: a) 60 tablets of 1 mg of alprazolam; b) 60 tablets of 40 mg OxyContin; c) 60 tablets of 10-325 mg oxycodone tabs; and d) 90 tablets of 10 mg of cyclobenzaprine.

14. On or about April 2, 2018, defendants TODD GOODMAN and ERIC PESTRACK filled prescriptions for Patient 5 and Patient 6, spouses who resided together and are known to the grand jury. Patient 5 and Patient 6 presented identical oxycodone prescriptions issued by the same out of state doctor for 120 tablets of 30 mg oxycodone; and 150 tablets of 30 mg oxycodone, which defendants GOODMAN and PESTRACK filled without question. About seven days later, on or about April 9, 2018, defendants GOODMAN and PESTRACK filled another set of identical prescriptions for

Patient 5 and Patient 6 from the same out of state doctor for 60 tablets of 60 mg extended-release oxycodone; and 60 tablets of 80 mg extended-release oxycodone. Among other red flags, defendants GOODMAN and PESTRACK ignored the fact that Patient 5 had been obtaining large quantities of opioids from multiple doctors since 2010.

15. For more than a four-year period, defendants TODD GOODMAN and ERIC PESTRACK dispensed, on at least a monthly basis, to Patient 7, who is known to the grand jury, large quantities of dangerous and addictive opioids and benzodiazepines. Patient 7's monthly prescriptions typically included a combination of oxycodone, OxyContin, amphetamines, methadone, and alprazolam. As defendants GOODMAN and PESTRACK knew, such combinations of drugs were potentially lethal.

16. On or about April 24, 2019, July 10, 2019, August 9, 2019, September 4, 2019, and October 2, 2019, defendants TODD GOODMAN and ERIC PESTRACK charged Patient 8, known to the grand jury, a $25 "Narc Member" fee above the insurance copay for at least five opioid prescriptions distributed by defendants GOODMAN and PESTRACK.

All in violation of Title 21, United States Code, Section 846.

## COUNTS TWO THROUGH TEN

### (Distribution of Controlled Substances)

**THE GRAND JURY FURTHER CHARGES THAT:**

At all times material to this indictment:

1. Paragraphs 1 through 19 and 21 through 27 of Count One are incorporated here.

2. On or about each of the dates listed below, in Philadelphia, in the Eastern District of Pennsylvania, defendants

**TODD GOODMAN**
**ERIC PESTRACK**

knowingly and intentionally distributed and dispensed, and aided and abetted the distribution and dispensing of, outside the usual course of professional practice and for no legitimate medical purpose, a mixture and substance containing a detectable amount of a Schedule II or Schedule IV controlled substance, as listed below (each distribution constituting a separate count of this indictment):

| COUNT | Approx. Date | Drug | Schedule | Quantity |
|---|---|---|---|---|
| 2 | December 13, 2017 | OxyContin 40 mg. | II | 60 |
|   |   | Alprazolam 1 mg. | IV | 60 |
|   |   | Oxycodone 10 mg. | II | 60 |
| 3 | January 10, 2018 | Oxycodone 30 mg. | II | 270 |
| 4 | March 21, 2018 | Oxycodone 30 mg. | II | 240 |
| 5 | April 21, 2018 | Oxycodone 30 mg. | II | 240 |
| 6 | May 26, 2018 | Oxycodone 30 mg. | II | 240 |
| 7 | June 20, 2018 | Oxycodone 30 mg. | II | 240 |
| 8 | August 13, 2018 | Oxycodone 30 mg. | II | 240 |
| 9 | September 5, 2018 | Oxycodone 30 mg. | II | 240 |
| 10 | October 24, 2018 | Oxycodone 30 mg. | II | 150 |
|   |   | Alprazolam 1 mg. | IV | 45 |
|   |   | Methadone 10 mg. | II | 150 |
|   |   | Adderall | II | 60 |

All in violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(C), (b)(1)(E), and Title 18, United States Code, Section 2.

## NOTICE OF FORFEITURE

THE GRAND JURY FURTHER CHARGES THAT:

1. As a result of the violations of Title 21, United States Code, Sections 841(a)(1) and 846 set forth in this indictment, defendants

**TODD GOODMAN**
**ERIC PESTRACK**

shall forfeit to the United States of America:

(a) any property used or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such offenses;

(b) any property constituting, or derived from, proceeds obtained directly or indirectly from the commission of such offenses, including but not limited to:

i. A sum of money in United States currency representing the amount of proceeds obtained as a result of the violations of the Controlled Substances Act.

2. If any of the property subject to forfeiture, as a result of any act or omission of the defendants:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the Court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty; it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant(s) up to the value of the property subject to forfeiture.

All pursuant to Title 21, United States Code, Section 853.

**A TRUE BILL:**

████████████████████

**GRAND JURY FOREPERSON**

_____
**JAQUELINE C. ROMERO**
**UNITED STATES ATTORNEY**

No. _ _ _ _ _ _ _ _

**UNITED STATES DISTRICT COURT**

Eastern District of Pennsylvania

Criminal Division

THE UNITED STATES OF AMERICA

vs.

TODD GOODMAN
ERIC PESTRACK

INDICTMENT

21 U.S.C. §846 (conspiracy to distribute controlled substances – 1 count)
21 U.S.C. §841 (distribution of controlled substances - 9 counts)
18 U.S.C. §2 (aiding and abetting)
Notice of forfeiture

Filed in open court this ___1st___ day,
of __December__ A.D. 20__22__

_____
Clerk

Bail, $_____

