**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 22-435 |
| TODD GOODMAN<br>ERIC PESTRACK | : | |

**GOVERNMENT'S TRIAL MEMORANDUM**

The United States of America, by its attorneys Jacqueline C. Romero, United States Attorney for the Eastern District of Pennsylvania, Joan E. Burnes and Eileen Castilla Geiger, Assistant United States Attorneys for the District, and Robert Smulktis, Special Assistant United States Attorney for the District, respectfully submits this trial memorandum to outline the government's case and assist the Court in the trial of this matter. On December 1, 2022, a federal grand jury returned a nine-count indictment charging defendants Todd Goodman and Eric Pestrack with conspiring (with Mitchell Spivack) to distribute controlled substances, in violation of 21 U.S.C. § 846 (Count One), and distributing, and aiding and abetting the distribution of, controlled substances, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C), (b)(1)(E) and 18 U.S.C. § 2 (Counts Two through Ten).[1] Trial is scheduled to commence on September 12, 2023.

## I. SUMMARY OF EVIDENCE

The trial evidence will show that, from 1987 through 2021, Mitchell Spivack, a licensed pharmacist, owned and ran Verree Pharmacy ("Verree"), a small, Fox Chase neighborhood pharmacy that was open seven days per week. Verree was registered with the Drug Enforcement Administration ("DEA") to purchase and dispense Schedule II through V controlled substances.

---

[1] The government has moved to dismiss Counts Two and Ten of the indictment.

1

For approximately twenty years, Todd Goodman was a part-time pharmacist at Verree. Likewise, for more than thirty years, Eric Pestrack was the lead pharmacy technician at Verree. Goodman and Pestrack were trusted employees; they had keys to Verree and the combination to the safe that contained cash and controlled substances.

Verree maintained a computer system to acquire, track, dispense, and bill for prescription drugs dispensed by the pharmacy. Goodman, Pestrack, and Spivack logged onto Verree's computers with a login and password, and they would assign their initials to each activity taken. The pharmacy computer system thus recorded the initials of the pharmacist and technician who completed any activity taken. The computer system also maintained a patient profile record for each customer who filled prescriptions at Verree.[2]

Verree cultivated a reputation as an easy-fill, no-questions-asked pharmacy for patients seeking to fill opioid prescriptions. In fact, Verree became the top retail pharmacy purchaser of oxycodone, a Schedule II controlled substance, in Pennsylvania. Verree filled so many opioid prescriptions that a long line of customers sometimes extended outside the pharmacy.

From at least 2012 through 2019, Goodman, Pestrack, and Spivack conspired to distribute controlled substances outside the course of professional practice and without a legitimate medical purpose. As part of the scheme, the co-conspirators dispensed and distributed, and aided and abetted the distribution of, controlled substances based on obviously altered prescriptions for oxycodone. They did so without verifying the forged prescriptions with

---

[2] The profile included the patient's biographical information, insurance plan, each drug prescribed for the patient, name of the prescriber issuing the drug, the date on which each prescription was filled, and the number of refills permitted. The profile contained a comment section for the pharmacist and/or pharmacy technician to include relevant information, including prescribers' verification for controlled substance prescriptions and preferences.

the issuing physician and ignoring obvious "red flags."[3] Moreover, to avoid scrutiny by health care benefit programs which monitored the amount of opioids dispensed, the co-conspirators frequently required payment in cash for oxycodone prescriptions, even when the customer had insurance.

Specifically, from 2012 until 2019, Goodman and Pestrack filled forged oxycodone prescriptions for customers Mohamed Ahmad and his wife, Linda. For years, Mohamed Ahmad would draw a line in the center of a valid prescription that a doctor, Dr. J.E., had written for him or his wife. Mohamed Ahmad would then add in a forged oxycodone prescription, with falsified amounts and dosage units, on the right side of the prescription. Mohamed Ahmad would try to get his forged prescriptions filled by Verree at times when Pestrack was working, as Pestrack would do "favors" for him, like occasionally filling his prescriptions early.

Altogether, the Ahmads paid more than $150,000 in cash for their altered prescriptions to be filled by Verree. When Mohamed Ahmad presented a legitimate insurance card to pay for the oxycodone prescriptions, Pestrack urged him to pay in cash, advising that "insurance won't cover these . . . cash only, cash preferred." Pestrack would put the cash that the Ahmads would give him for their forged prescriptions into his pockets.

On each of the dates below, for example, Goodman and Pestrack filled altered oxycodone prescriptions for the Ahmads:

| Approx. Date | Drug | Approx. Cash Payment | Overt Act or Count in Indictment |
|---|---|---|---|
| June 10, 2015 | 240 oxycodone 30 mg | $600 | Overt Act 1 |

---

[3] A "red flag" includes anything about a controlled substance prescription that would cause the pharmacist to be concerned that the prescription was not issued for a legitimate medical purpose by a registered prescriber in the usual course of professional practice. *See* Indictment ¶ 18, pg. 6 (listing examples of red flags).

| June 17, 2015 | 240 oxycodone 30 mg | $720 | Overt Act 2 |
|---|---|---|---|
| March 29, 2017 | 360 oxycodone 30 mg | $1,080 | Overt Act 3 |
| April 5, 2017 | 360 oxycodone 30 mg | $1,080 | Overt Act 4 |
| May 3, 2017 | 240 oxycodone 30 mg | $720 | Overt Act 5 |
| May 17, 2017 | 240 oxycodone 30 mg | $720 | Overt Act 6 |
| May 31, 2017 | 240 oxycodone 30 mg | $720 | Overt Act 7 |
| June 14, 2017 | 360 oxycodone 30 mg | $1,080 | Overt Act 8 |
| July 12, 2017 | 270 oxycodone 30 mg | $810 | Overt Act 9 |
| August 2, 2017 | 300 oxycodone 30 mg | $900 | Overt Act 10 |
| November 22, 2017 | 240 oxycodone 30 mg | $720 | Overt Act 11 |
| January 10, 2018 | 270 oxycodone 30 mg | $810 | Count 3 |
| March 21, 2018 | 240 oxycodone 30 mg | $720 | Count 4 |
| April 21, 2018 | 240 oxycodone 30 mg | $810 | Count 5 |
| May 26, 2018 | 240 oxycodone 30 mg | $820 | Count 6 |
| June 20, 2018 | 240 oxycodone 30 mg | $820 | Count 7 |
| August 13, 2018 | 240 oxycodone 30 mg | $760 | Count 8 |
| September 5, 2018 | 240 oxycodone 30 mg | $820 | Count 9 |

As the evidence will show, these prescriptions bore blatant "red flags," including: obvious alterations and manipulations (such as names changed, and dates scratched off and scribbled over); two drugs on one paper prescription (including one non-controlled substance on the left side, and oxycodone added on the right side by forgery); exceptionally high doses of opioids; and/or cash payments ranging from $600 to over $1,000. Moreover, some prescriptions had "Rx" written on them instead of "Dx" for diagnosis codes, with forged diagnosis codes added. Despite these "red flags," Goodman and Pestrack did not ask any questions, and did not turn away the Ahmads. Nor did Goodman and Pestrack verify the obviously forged prescriptions with the doctor who allegedly prescribed the drugs, Dr. J.E. Had they contacted Dr. J.E. as required, he would have informed them that the prescriptions were forgeries.

Furthermore, the defendants attempted to conceal the fact that they were receiving cash payments for these prescriptions to avoid drawing regulatory attention. For example, the defendants included the notation "WC" (worker's compensation) on the receipts for the forged

prescriptions—even though the Ahmads never told them about any worker's compensation claim. The defendants also logged into the Prescription Drug Monitoring Program ("PDMP") system that the prescriptions were being paid for by "commercial insurance," despite the cash payments.

In addition to their dispensing of forged prescriptions, Goodman and Pestrack also dispensed highly dangerous "Trinity Cocktail" prescriptions, consisting of a combination of an opioid, a benzodiazepine, and a muscle relaxant. Such combinations should have raised "red flags" that the prescriptions were not issued for a legitimate medical purpose and outside the course of professional practice.

From around January 2014 through December 2019, Rochester Drug Cooperative ("RDC") served as Verree's wholesale supplier of controlled substances. Verree's former supplier had stopped doing business with the pharmacy because of diversion concerns. RDC's compliance department urged Verree to create policies to prevent diversion of controlled substances by its customers, given RDC's concerns about Verree's opioid distribution. As a result, Verree created a "Due Diligence Procedure for Controlled Substances" to ensure that RDC would continue to supply oxycodone. Spivack, Goodman, Pestrack, and L.K. (a pharmacy technician at Verree) signed the policy document dated August 1, 2016, confirming that they would enforce the procedures as written. Despite their assurances, the Verree employees failed to adhere to the policies. In November 2018, RDC notified Verree that it would impose a mandatory reduction in the amount of controlled substances that it would provide, due to ongoing concerns over the pharmacy's diversion practices.

Around the same time that RDC limited Verree's opioid supply, the defendants created a "Narc Members" club that required patients to pay "dues" to ensure that their prescriptions for

5

oxycodone would be filled without question. "Narc Members" typically paid the defendants monthly dues of between $25 to $100 in cash, in addition to their co-pays or the costs of their prescriptions if they paid in cash. The defendants did not inform these customers that they were part of the "Narc Members" club.

## II.     ELEMENTS OF THE OFFENSES

### A. _Ruan v. United States_

The Controlled Substances Act ("CSA") makes it a federal crime, "[e]xcept as authorized[,] . . . for any person knowingly or intentionally . . . to manufacture, distribute, or dispense . . . a controlled substance," such as opioids. 21 U.S.C. § 841(a). Under applicable regulations, a prescription is "authorized" when a licensed practitioner issues it "for a legitimate medical purpose . . . acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a).

In _Ruan v. United States_, 142 S. Ct. 2370 (2022), the Supreme Court held that a medical practitioner may be convicted under the CSA only if the practitioner "knowingly or intentionally" prescribes a controlled substance for a non-legitimate medical purpose outside the usual course of his or her professional practice. Specifically, the _Ruan_ Court determined that the CSA's "'knowingly or intentionally' _mens rea_ applies to authorization." _Id_. at 2375.

Accordingly, once "a defendant produces evidence that he or she was authorized to dispense controlled substances, the Government must prove beyond a reasonable doubt" that (1) "the defendant knew that he or she was acting in an unauthorized manner"—_i.e._, not "'for a legitimate medical purpose . . . in the usual course of his [or her] professional practice'"; or (2) the defendant "intended to do so." _Id._ (quoting 21 C.F.R. § 1306.04(a)). The Court based that conclusion on the "longstanding presumption . . . that Congress intends to require a defendant to

possess a culpable mental state." *Id*. at 2377 (quotation marks omitted). It further observed that "Section 841 contains a general scienter provision—'knowingly or intentionally'" and reasoned that, "in § 841 prosecutions [of practitioners for dispensing drugs via prescription], a lack of authorization is often what separates wrongfulness from innocence." *Id*. Finally, the Court noted that "[t]he Government . . . can prove knowledge of a lack of authorization through circumstantial evidence," and that "the scope of a doctor's prescribing authority" remains tethered to "objective criteria such as 'legitimate medical purpose' and 'usual course' of 'professional practice.'" *Id*. at 2382.

The elements of the offenses described below reflect *Ruan*'s guidance.

B. **Conspiracy to Distribute Controlled Substances (Count One)**

To prove a violation of 21 U.S.C. § 846, the government must establish that:

1. Two or more persons agreed to unlawfully distribute a controlled substance (oxycodone) outside the usual course of professional practice and not for a legitimate medical purpose;

2. That the defendant was a party to or member of that agreement; and

3. That the defendant joined the agreement or conspiracy knowing of its objectives, and intended to join together with at least one other alleged conspirator to achieve that objective; that is, the defendant and at least one other alleged conspirator shared a unity of purpose and the intent to achieve that objective.

3rd Circuit Model Criminal Jury Instructions, 6.21.846B; *see also Ruan v. United States*, 142 S. Ct. 2370 (2022).

The *mens rea* requirement for conspiracy essentially dovetails with the *mens rea* requirement for the substantive Section 841(a) offense. A conspiracy involves "an agreement with the 'specific intent that the underlying crime be committed' by some member of the conspiracy."

7

*Ocasio v. United States*, 578 U.S. 282, 288 (2016) (emphasis omitted).  If the jury finds that a

defendant joined the conspiracy knowing its unlawful object (distributing a controlled substance

not "for a legitimate medical purpose . . . in the usual course of . . . professional practice") and

specifically intended to help accomplish that goal, the jury will have necessarily concluded that

the defendant had the requisite knowledge contemplated in *Ruan*.

### C.  Distribution of Controlled Substances (Counts Three Through Nine)

To prove a violation of 21 U.S.C. § 841(a)(1), the government must establish that:

1.  The defendant knowingly or intentionally distributed oxycodone on or about the

    relevant dates listed in the indictment;

2.  At the time of the distribution of oxycodone, the defendant knew that the distribution

    involved a controlled substance; and

3.  The defendant knowingly or intentionally distributed the substance not for a

    legitimate purpose in the usual course of his professional practice.

*See Ruan v. United States*, 142 S. Ct. 2370 (2022).

The term "distribute" means the delivery or transfer of a controlled substance.  This

term includes the writing or issuing of a prescription.  The term "intentionally" means that the

act was done deliberately.  The term "knowingly" means that the individual understands the

nature of his conduct and has not acted through ignorance, mistake, or accident.[4]

---

[4] A practitioner who opts to indulge his or her idiosyncratic views of appropriate medical practice rather than adhering to accepted norms can potentially be deemed to have knowingly prescribed controlled substances outside the usual course of professional practice, in violation of Section 841(a).  *See Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011) (recognizing the "well established" principle that "defendants cannot escape the reach" of a "criminal statute[] requir[ing] proof that [they] acted knowing]" by "deliberately shielding themselves from clear evidence of critical facts that are strongly suggested by the circumstances").  In other words, the jury may find that the defendant acted knowingly if it finds beyond a reasonable doubt that: *first*, the defendant was aware of a high probability

Counts Three through Nine also allege a violation of 18 U.S.C. § 2 (aiding and abetting), which states "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." To "establish aiding and abetting, the government must prove the 'defendant associated himself with the criminal venture . . . participated in it as something he wished to bring about, and . . . sought by his words and actions to make it succeed.'" *United States v. Xavier*, 2 F.3d 1281, 1288 (3d Cir. 1993); *see also United States v. Carbo*, 572 F.3d 112, 118 (3d Cir. 2009) ("the government must prove the defendant . . . knew of the commission of the substantive offense and acted with intent to facilitate it."). In a drug case, a defendant who aids and abets the possession, manufacture, or distribution of controlled substances in violation of 21 U.S.C. § 841(a)(1) is liable as a principal. *United States v. Providence*, 378 Fed. Appx. 192, 194 (3d Cir. 2010).

## III.    WITNESSES

The government may call the following witnesses in its case-in-chief:

- Law enforcement witnesses

    o   John Gregory, Pennsylvania Attorney General's Office Bureau of Narcotics Investigation Agent

    o   MaryAnn Farnsworth, DEA Diversion Investigator

    o   Sherilyn Gillespie, Pennsylvania Department of State Bureau of Enforcement and Investigation Investigator

    o   Stephanie Yeager, Office of Inspector General Department of Health and Human Services Special Agent

    o   Ashley Bolton, Department of Health, Office of Drug Surveillance and Misuse Prevention Director

---

that his distribution of controlled substances was not for a legitimate medical purpose in the usual course of professional practice; and *second*, the defendant deliberately avoided learning the truth.

- Mohamed Ahmad

- Linda Ahmad

- Dr. John Eshleman

- William Delgado, former RDC employee[5]

- Eileen Strauss, former Verree employee

- Lee Kamp, former Verree employee

---

[5] Defense counsel has requested that the government produce as part of discovery "any and all civil and criminal target letters sent to RDC or any of its principals or employees or agents by the federal government; [and] any agreements between RDC (or any of its principals or employees or agents) and the federal government including civil settlement agreements, administrative agreements, non-prosecution or immunity agreements, plea agreements and cooperation agreements." The prosecution team has informed defense counsel that it is not in possession of any such target letters or agreements relating to RDC, a wholly separate case prosecuted in the Southern District of New York. *See* https://www.justice.gov/usao-sdny/pr/manhattan-us-attorney-and-dea-announce-charges-against-rochester-drug-co-operative-and. Defense counsel has contended that Rule 16 and *Brady* nonetheless require the prosecution team to obtain the requested materials from the U.S. Attorney's Office for the Southern District of New York.

Not so. Rule 16 extends only to materials "within the prosecutor's possession, custody or control." Fed. R. Crim. P. 16(a)(1)(E). Courts have routinely held that the "government" for purposes of Rule 16 and *Brady* is limited to the "prosecution team." *See United States v. Chalmers*, 410 F. Supp. 2d 278, 289-90 (S.D.N.Y. 2006) (finding that "the Court is not persuaded that the 'government' for purposes of Rule 16 should be any broader than the 'prosecution team' standard that has been adopted in the *Brady* line of cases") (collecting cases); *United States v. Volpe*, 42 F. Supp. 2d 204, 221 (E.D.N.Y. 1999) (construing "government" narrowly and refusing under Rule 16 to require the prosecution to turn over material in possession of different prosecution team within same U.S. Attorney's office); *see also United States v. Pelullo*, 399 F.3d 197, 218 (3d Cir. 2005) (concluding that "the prosecution is only obligated to disclose information known to others acting on the government's behalf *in a particular case*," and finding that the Pension and Welfare Benefits Administration was not a member of the prosecution team, despite some investigators assisting in the prosecution); *United States v. Pelullo*, 185 F.3d 863 (3d Cir. 1999) (holding that because the "government is not under an obligation to obtain and disclose all information in the possession of other arms of the government that are not involved in the particular prosecution," the prosecution was under no obligation to "ferret out evidence from another pending proceeding with a tenuous connection to the prosecution"); *United States v. Quinn*, 445 F.2d 940, 944 (2d Cir. 1971) (rejecting as "completely untenable" the position that "knowledge of any part of the government is equivalent to knowledge on the part of this prosecutor"). Indeed, "[c]learly the government cannot be required to produce that which it does not control and never possessed or inspected." *United States v. Hutcher*, 622 F.2d 1083, 1088 (2d Cir. 1980) (quoting *United States v. Canniff*, 521 F.2d 565, 573 (2d Cir. 1975)). Furthermore, and in any event, the fact that RDC and RDC executives may have received target letters or signed agreements has no bearing whatsoever on William Delgado's testimony.

- "Narc Members"

    o   Carolyn Markman

    o   Gregory McFadden

    o   Karen McCloskey

    o   Jennifer Chybinski

    o   Melissa Meile

    o   Sean Harbison

- Dr. Carl Gainor, Ph.D, J.D.

The government reserves the right to supplement its witness list, as necessary.[6]

## IV.    STIPULATIONS

The government has proposed stipulations to defense counsel that will streamline the trial for the Court's and the jury's convenience.  Specifically, the government has proposed authenticity and chain-of-custody stipulations for the following Verree records:

1)  The consensually imaged Verree Pharmacy server; and

2)  Copies of prescriptions seized from the October 10, 2019 warrant.

The government anticipates that these stipulations will reduce the length of this trial by obviating the need for any custodian of record testimony, such as having to call an SFL-9 (the DEA computer forensic lab) witness and seizing agents and investigators.

## V.    LEGAL AND EVIDENTIARY MATTERS

---

[6] The government requests that counsel for defendants identify any prospective witnesses they may call in the defense's case prior to *voir dire* so that the jury pool may appropriately be asked whether they are familiar with any potential witnesses.

In addition, the government reserves the right to call rebuttal witnesses in the event either defendant elects to present evidence or testimony in the defense case.

While not exhaustive, the government highlights below anticipated legal and evidentiary issues that may arise at trial.

## A. Exhibits and Summary Charts

The majority of the physical evidence in this case consists of copies of the forged prescriptions filled by Verree Pharmacy; a photograph of the outside of Verree Pharmacy; relevant Verree Pharmacy server and Prescription Drug Monitoring Program ("PDMP") data; and correspondence and documents exchanged between Verree and RDC (including the "Due Diligence Procedure for Controlled Substances" signed by Goodman and Pestrack).[7]

The government reserves the right to supplement this preliminary description of exhibits. A binder with hard copies of the exhibits will be provided to the Court and the defense on the day of jury selection. The government also intends to display these exhibits electronically to the jury once admitted.

The government may also introduce into evidence summary charts based on prescriptions filled by the Ahmads at Verree, including charts of (1) the forged prescriptions charged as overt acts and individual counts in the indictment; and (2) the total universe of forged prescriptions dispensed by the pharmacy over the years. In addition, the government may introduce financial records showing the pharmacy's profits (and payments received by the defendants) by way of summary chart. Further, the government may introduce a timeline of the relevant activity in this case, as well as a summary of Verree's concerning dispensing practices that drew regulators' and RDC's attention to the pharmacy.

---

[7] The government expects that witness William Delgado will authenticate the RDC records at trial.

The summary charts of the altered prescriptions, which will be disclosed to the defendants before trial, are based on the evidence of the forged prescriptions. So too are any summary charts of financial activity. Under Federal Rule of Evidence 1006, summary charts are admissible if they are based upon evidence that is: (i) voluminous, (ii) admissible, and (iii) available to the opponent. *United States v. Strissel*, 920 F.2d 1162, 1163-64 (4th Cir. 1990). Although much of the evidence underlying the government's summary charts will, in fact, be offered for admission, it is not necessary that all the evidence depicted in the charts be admitted as long as it is admissible. *See id.*; *United States v. Janati*, 374 F.3d 263, 272-73 (4th Cir. 2004) (evidence underlying Rule 1006 summary need not be admitted). Such decisions are committed to the sound discretion of the trial court, which in this context is very broad. *United States v. Bansal*, 663 F.3d 634, 668 (3d Cir. 2011).

In addition to summaries of voluminous evidence, the government may also rely upon charts or summaries as educational devices. *See Pierce v. Ramsey Winch Co.*, 753 F.2d 416, 431 (5th Cir. 1985) ("[I]t is critical to distinguish between charts or summaries as evidence and charts or summaries as pedagogical devices"). Under the rules, and even apart from Rule 1006, a trial court "has the discretion to permit the parties to show to the jury charts and other visual aids that summarize or organize testimony or documents that have already been admitted in evidence." *Id*. A timeline of the relevant activity, as well as a chart of Verree's concerning dispensing practices, would help educate the jury.

**B. <u>Summary Witnesses</u>**

The government will use federal agents to testify as summary witnesses in connection with the presentation of much of the evidence described above. This testimony is properly admitted under Federal Rule of Evidence 1006 to describe the contents of voluminous

prescriptions/records which cannot conveniently be examined in court. *United States v. Haidara*, 112 F.3d 511, 2007 WL 205378 *2 (4th Cir. 1997) (not published). Here, the evidence is voluminous by any definition, and individual examination in court would be inconvenient and time-consuming. Thus, summary testimony is both necessary and appropriate under Rule 1006.

Summary testimony is also appropriate under Rule 611(a) if the evidence would aid the jury in ascertaining the truth and would not be overly prejudicial to the defendant. *Id.* In this case, there is a large body of documents and other evidence within the purview and knowledge of the government agents. This includes, for example, the Verree Pharmacy server data, PDMP data, and prescriptions filled by Verree. Simply put, an agent may testify about and summarize that material. *United States v. Moore*, 997 F.2d 55, 57-59 (5th Cir. 1993).

### C. **Impeachment/Rebuttal Evidence**

The government does not plan to introduce evidence of Pestrack's sexual advances on a vulnerable Verree customer in exchange for pills.[8] Nonetheless, should the defendants kick open the door to extrinsic issues, the government may seek permission to introduce this evidence as impeachment or rebuttal evidence.

Likewise, if the government ultimately does not present evidence of the "Bill But Don't Fill" ("BBDF") scheme in its case-in-chief, it reserves the right to introduce such evidence as impeachment/rebuttal evidence if the defendants put their knowledge and motive at issue.[9]

---

[8] Specifically, Pestrack sought sex from a customer, C.N., in exchange for Xanax pills that he would provide to her without prescriptions. When dropping pills off at C.N.'s home, Pestrack exposed himself to her, and touched and groped her.

[9] The government has moved *in limine* to introduce evidence of the "BBDF" conduct.

14

**D. Use of Agents' Reports to Cross-Examine Witnesses**

The government has provided voluminous discovery, including numerous reports of witness interviews taken by government agents. To the extent that the agents who prepared the reports testify, those reports, if materially inconsistent, provide an appropriate basis for impeachment of the agents. Under the Federal Rules of Evidence, however, those reports may not be used to impeach the subject of the underlying interview unless the subject has somehow adopted those reports. *United States v. Almonte*, 956 F.2d 27, 29 (2d Cir. 1992).

As a matter of evidence, the burden "of proving that notes reflect the witness' own words rather than the note-taker's characterization falls on the party seeking to introduce the notes." *Id.* Thus, a party seeking to use a report to impeach bears the burden of proving a rational basis for concluding that the report either was adopted by the witness or represents the verbatim transcript of the witness' statement. *Id.* at 30. In the absence of such proof, cross-examination from such reports or notes should be carefully scrutinized so that a statement that is otherwise inadmissible is not improperly read into the record. *See United States v. Shoenborn*, 4 F.3d 1424, 1427-28 and n.3 (7th Cir. 1993).

In *Almonte*, a DEA agent testified at trial about the post-arrest statements that he had obtained from two defendants who were being tried. *Almonte*, 956 F.2d at 28. One defendant sought to impeach the agent by admitting interview notes taken by an Assistant U.S. Attorney ("AUSA") who had interviewed the agent as a prior inconsistent statement. *Id.* at 28-29. The district court rejected the effort and the Second Circuit affirmed, holding that the AUSA's notes were not the agent's statement, but merely a "third party's characterization" of the agent's statement, and therefore irrelevant as an impeaching prior inconsistent statement and consequently inadmissible:

15

We have held, however, that a "third party's characterization" of a witness's statement does not constitute a prior statement of that witness unless the witness has subscribed to that characterization. . . . Thus, in the absence of endorsement by the witness, a third party's notes of a witness's statement may not be admitted as a prior inconsistent statement unless they are a verbatim transcript of the witness's own words. The problem, in essence, is one of relevancy. If a third party's notes reflect only that note-taker's summary characterization of a witness's prior statement, then the notes are irrelevant as an impeaching prior inconsistent statement, and thus inadmissible.

*Id.* at 29 (citation omitted).

### E. <u>Defense Use of Defendant's Statement</u>

The government may present Pestrack's statements to law enforcement as admissions of a party opponent under Fed. R. Evid. 801(d)(2). Such evidence, when introduced by the government against the opposing party, is by definition not hearsay. Fed. R. Evid. 801(d). Accordingly, documents written by a party may be admitted against the party who wrote them, *United States v. Siddiqui*, 235 F.3d 1318, 1323 (11th Cir. 2000), and confessions may be admitted against the party who gave them. *United States v. McDaniel*, 398 F.3d 540, 545 (6th Cir. 2005).

These statements may not be admitted by the party who made the statements because Rule 801(d)(2) does not allow a party "to introduce his or her *own* statements through the testimony of other witnesses." *Id.* (emphasis in original). These statements would be offered by the defendant for their truth, Fed. R. Evid. 801(c), and would impermissibly enable the defendant to introduce his self-serving hearsay statements through the government's witnesses without subjecting the defendant to cross-examination. *United States v. Kapp,* 781 F.2d 1008, 1014 (3d Cir. 1986) (ruling that tape recording of a conversation between a codefendant and a government informant that the defendant considered exculpatory on the issue of his knowledge of illegality was inadmissible because it was not offered "against a party" as required by Rule 801(d)(2)).

Indeed, if such statements were admissible, "parties could effectuate an end-run around the adversarial process by, in effect, testifying without swearing an oath, facing cross-examination, or being subjected to first-hand scrutiny by the jury." *McDaniel*, 398 F.3d at 545; *see also United States v. Palow*, 777 F.2d 52, 56 (1st Cir. 1985) (Rule 801(d)(2)(A) simply requires that an admission at issue be contrary to a party's position at trial, and that the requirement that an admission be offered against a party is designed to exclude the introduction of self-serving statements by the party making them); *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982) (a party's statement, if offered against him, is not hearsay under Rule 801(d)(2)(A) but is hearsay and not admissible if offered by the party himself).

### F. <u>Reference to Punishments for Charged Offenses</u>

The punishment for the offenses charged is not a proper matter for the jury's consideration. *See Shannon v. United States*, 512 U.S. 573 (1994); *United States v. Fisher*, 10 F.3d 115, 121 (3d Cir. 1993); *United States v. Austin*, 533 F.2d 879, 885-86 & n.14 (3d Cir. 1976); *see generally* 1 L. Sand, J. Siffert, W. Loughlin, and S. Reiss, *Modern Federal Jury Instructions -- Criminal* ¶ 9.01 (1993). As the court observed in *United States v. Greer*, 620 F.2d 1383, 1384 (10th Cir. 1980): "The authorities are unequivocal in holding that presenting information to the jury about possible sentencing is prejudicial." Questioning and argument addressing these issues, thus, would be improper. Evidence should be excluded where it is irrelevant to the issue being tried or where it will "induce the jury to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented." *United States v. Vretta*, 790 F.2d 651, 655 (7th Cir. 1986) (citation omitted). Accordingly, all references by defense counsel or witnesses to punishment for the offenses charged should not be permitted.

## G. **Character Witnesses**

Rule 405(a) allows only two methods of proving character: reputation and opinion. Reputation evidence is from a person who knows the defendant's reputation in the community. It is not the witness's own opinion, but his or her understanding of what the community thinks of the defendant. Opinion evidence is the witness's own opinion about the defendant's character, which can come from a number of sources. Fed. R. Evid. 405(a).

A witness called to testify regarding a person's character may not testify about specific instances of good conduct on direct examination. *Id*. According to the Rule, however, "[o]n cross-examination, inquiry is allowable into relevant specific instances of conduct." *Id*. Questions about specific instances of conduct, which would otherwise be impermissible, are allowed on cross-examination of a character witness for the purpose of testing the character witness's knowledge of the defendant's reputation in the community, or the witness's opinion of the defendant.

The cross-examination permitted by Rule 405(a) includes prior bad conduct by the defendant. As the Supreme Court noted in *Michelson*: "The price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him." *Michelson v. United States*, 335 U.S. 469, 479 (1948) (cross-examination of character witness regarding year 20-year-old conviction for violating the trademark laws and 27-year-old arrest for receiving stolen goods permissible); *see United States v. Evans*, 569 F.2d 209, 210 (4th Cir. 1978) (trial court did not abuse its discretion by allowing the prosecutor ask character witnesses whether they knew of the defendant's prior convictions for larceny, assault with a deadly weapon, and receiving stolen goods, and of his arrests for assault on a female, failure to stop for

a police vehicle, and driving 110 miles per hour in a 55 miles per hour zone); *Government of Virgin Islands v. Roldan*, 612 F.2d 775 (3d Cir. 1979) (asking whether witness knew defendant had been convicted of murder permitted); *United States v. Lundy*, 416 F. Supp. 2d 325, 337 (E.D. Pa. 2005) (inquiry into charges which were dismissed or conduct for which a defendant was acquitted is proper).

Under Rule 405(a), the government may inquire into relevant specific instances of conduct to show the jury that the direct testimony about the defendant's good character paints an incomplete picture. By pointing to instances of a defendant's misconduct, the government can discredit the defendant's character witnesses by showing that they are too biased or too uninformed to portray the defendant accurately. Therefore, on cross-examination, courts have regularly permitted the prosecutor to ask the defendant's character witnesses if he has heard about, or if his opinion would be affected by, certain past instances of the defendant's misconduct, as long as the prosecutor has a good faith basis for his information. *See United States v. Glass*, 709 F.2d 669, 673 (11th Cir. 1983). Cross-examination of a reputation witness can include questions "about conduct, and even about charges, which may have come to the attention of the relevant community." *United States v. Curtis*, 644 F.2d 263, 268 (3d Cir. 1981).

The Court may limit the number of character witnesses, which is a common practice and has been held to be within the trial court's discretion. *United States v. Gray*, 105 F.3d 956, 963 (5th Cir. 1997) (affirming district court's decision to limit defendant to two character witnesses and noting that "[t]his court has repeatedly allowed a maximum of three character witnesses"); *United States v. Johnson*, 730 F.2d 683, 688 (11th Cir. 1984) (affirming district court's decision to limit number of character witnesses to three); *United States v. Koessel*, 706 F.2d 271, 275 (8th Cir. 1983) (affirming district court's limit of three character witnesses); *United States v. Henry*,

560 F.2d 963, 965 (9th Cir. 1977) (district court did not abuse its discretion in limiting a defendant to two character witnesses).

## H. Evidence of Specific Facts to Demonstrate Character

As noted above, under Rule 405(a), evidence concerning any specific acts the defendants may have performed, no matter how laudable, is not admissible. This is true even if the witness is not designated as a character witness. A defendant is not permitted to introduce evidence of his or her own good behavior on other occasions to demonstrate a lack of criminal intent during the commission of the charged crime. *See e.g.*, *United States v. Winograd*, 656 F.2d 279, 284 (7th Cir. 1981) ("evidence that Siegel engaged in certain legal trades is generally irrelevant to the issue of whether he knew of other illegal trades").

Therefore, the defendants should be precluded from attempting to present evidence of any specific acts for which they may have been commended, because evidence of good conduct is not relevant to negate criminal intent, and is merely an improper attempt to portray a defendant as a person of good character through the introduction of prior "good acts." *See United States v. Ellisor*, 522 F.3d 1255, 1267 (11th Cir. 2008) (evidence of defendant's allegedly legitimate business activities was inadmissible in his mail fraud prosecution because it did not bear on his intent to defraud with respect to the act in question); *United States v. Marrero*, 904 F.2d 251, 260 (5th Cir. 1990) ("The fact that Marrero did not overcharge in every instance in which she had an opportunity to do so is not relevant to whether she, in fact, overcharged as alleged in the indictment."). Testimony by others about the defendants' good works is, in essence, improper character testimony concerning specific instances of purportedly good conduct and should not admitted.

Respectfully submitted,

JACQUELINE C. ROMERO
United States Attorney

*/s Joan E. Burnes / Eileen Castilla Geiger*
JOAN E. BURNES
EILEEN CASTILLA GEIGER
Assistant United States Attorneys


ROBERT SMULKTIS
Special Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I certify that I caused a copy of the Government's Trial Memorandum to be served by ECF on:

Rocco C. Cipparone, Jr., Esq.<br>Thomas B. Malone, Esq.

*/s Eileen Castilla Geiger*
EILEEN CASTILLA GEIGER
Assistant United States Attorney

Dated: August 25, 2023.